Case number 16-1412. Todd Mattox v. Adam Edelman et al. Four arguments not to be seen. 15 minutes for plaintiffs. 15 minutes to be sheared by defendants. Susan Rosano for the plaintiff. Good morning. Good morning. May it please the court. My name is Susan Rosano and I represent the appellant Mr. Todd Mattox. I'd like to reserve four minutes for rebuttal please. All right. Mr. Mattox exhausted all of his claims against Drs. Pandia and Borgerding before he brought them into court. He exhausted both pre- and post-complaint grievances as to both doctors. And although our briefs talk about this double exhaustion with respect to both doctors, I want to focus the court's attention this morning on the pre-complaint grievances with respect to Dr. Pandia and the post-complaint grievances with respect to Dr. Borgerding. And for all other arguments with respect to the doctors and to P.A. Neff, we'd like to stand on our briefs. Mr. Mattox's pre-complaint grievances complained about a lack of treatment for his chronic heart condition, ineffective medication, and a lack of an alternative treatment plan for those issues. These issues provided prison officials with notice of what the problem was and gave them an opportunity to cure that problem before he sued Dr. Pandia. Dr. Borgerding did not interact with Mr. Mattox until after Mr. Mattox filed his original complaint. So at the time of the original complaint, Mr. Mattox had no grievances or administrative remedies to exhaust with respect to Dr. Borgerding. When those remedies became available, he exhausted them and then he brought Dr. Borgerding to court. It's not as if Mr. Mattox was trying to make an end run around the PLRA's exhaustion requirement by exercising his right to amend under Rule 15. He exhausted his remedies and then he brought the doctor into court. Now defendants' reading of the PLRA and the interaction between the PLRA and Rule 15 essentially repeals Rule 15 and there's nothing in the statute or in the Federal Rules of Civil Procedure that compel that result. Now we don't have a Sixth Circuit case that talks about whether grievances have to be exhausted before amending a pending complaint or a complaint on a pending lawsuit. So this issue in a sense is sort of a matter of first impression in our circuit. Is that right? I agree with that, yes. The three other circuits that have addressed this question so far, the Third, Seventh, and Ninth Circuit, have found that it's appropriate to allow inmates to amend their complaints so long as they have exhausted their administrative remedies before making that amendment. So a lawsuit can be commenced, the prisoner can have unexhausted grievances that are exhausted during the pendency of the complaint and your argument would be they can then amend, should be permitted to amend, to add the grievances after they are exhausted. Well, it's a little bit different than that, Your Honor. Mr. Maddox here exhausted his grievances, filed an original complaint, and then he exhausted additional grievances as to new claims and then he moved to amend. So at no point were any of his claims unexhausted before he brought any of the defendants into court. Well, weren't some of the new claims exhausted after the lawsuit had been filed, after it had been commenced? Yes, that I agree with and I think that gets to defendants' argument of the reading or interpretation of the difference between action and claim in the PLRA statute. And I think the Supreme Court has addressed that issue in the Jones v. Bach opinion where they said that there is no difference between those words, they're synonymous for the purposes of the PLRA. And just a judge ruled to the contrary saying that all the claims had to be exhausted before the lawsuit was actually commenced. Is that the problem we have here? He sued a set of doctors in his first complaint. He exhausted additional administrative remedies and then he sued a new set of doctors. He wasn't trying, like I said before, to make an end run around the exhaustion requirement of the PLRA. So how does his actions, I guess, satisfy the exhaustion requirements as it relates to Corizon, the medical institution? We've dropped our claims as to Corizon. What claims have you dropped, did you say? The Monell claims against Corizon. All right. Well, the claim, he had filed all these grievances, I shouldn't say all because there weren't that many, but certainly more than many inmates filed having to do with this cardiac catheterization that he wanted at some point in time. But those claims are not before us either, are they? That's correct. That catheterization is just to see how much plaque is in his heart, the order and so on? I believe that's what that procedure is for. That's correct. And the system said that's too expensive. Is that right? That's right. And as we said in our opening brief, the cardiac catheterization issue, I think, is really relevant to Dr. Adelman, who Mr. Maddox sued in his original complaint. And we did not pursue an appeal as to the court's decision on Dr. Adelman. Maybe I should recuse myself. I've had the heart catheterization and triple bypass surgery. You're familiar with the symptoms that my client is going through, perhaps. To get into Dr. Pandya a little bit more, like I said, his pre-complaint grievances exhausted the claims as to him. Now, the law on grievances is that they must alert prison officials to an issue so that they can address it before it becomes a lawsuit. The district court below said that nowhere in Mr. Maddox's pre-complaint grievances did he complain about ineffective medication, but I think this is simply wrong. Three times in his second grievance and twice in his third grievance, he complains about a lack of efficacy of his medication. And in fact, prison officials acknowledge the fact that his medication isn't working in their step two responses to his grievances, to his first and his third grievance. Wasn't it the case that not only was it not working, but didn't the outside hospital basically say whatever the treatment protocol that was being employed, that there was a potential risk of harm, that it wasn't working, but it could also have some harmful side effects? That's right. And those adverse side effects are documented in Mr. Maddox's medical records and in one of the grievance. So it was notification both from the prisoner himself and from the outside medical facility? That's right. The outside medical facility's thoughts are in his medical records. And the prison officials identified this problem when they wrote in the response acknowledging that one of the side effects of one of the drugs that Mr. Maddox was getting was that it caused him severe dizziness. Dr. Pandya argued before this court that there was nothing in his step three grievance that could possibly have put prison officials on notice of his involvement with Mr. Maddox's claim. But I again think that this is completely wrong. Mr. Maddox, in his third grievance at the step one level, identifies a John Doe MDOC doctor. And then in the step two response after the prison began investigating Mr. Maddox's claims, they quoted directly from a medical record that Dr. Pandya himself had generated, in which Dr. Pandya says and is quoted in the response, Mr. Maddox is on these nitrates, despite the fact that he's on these nitrates, he's still having recurrent trips to the hospital. And what's not quoted in the step two response, but is clearly in the record that they were quoting from, is the fact that Dr. Pandya was also denying Mr. Maddox an alternative drug. These issues go to the merits of whether the defendants were deliberately indifferent to your client's medical needs, which would be a matter of the merits of the grievances filed under the Prison Litigation Reform Act. Is that really before us, this issue of deliberate indifference? I mean, if we were to send the case back, I would imagine there might be a motion for summary judgment saying that there's nothing to these claims of deliberate indifference. Your client really hasn't suffered any adverse consequences and he's claiming that the judiciary should be in the examining room deciding what medication he should get and all of that. But that's not really our issue, is it, at this point. We're just trying to decide whether the complaint can be amended in terms of the exhaustion requirement. Whether he has to exhaust, whether exhausted claims can be appended or incorporated into an amended complaint when those claims were not exhausted at the time the complaint was filed. Is that our only issue here, or what are you asking us to do on appeal here? I don't think you need to address the merits of the deliberate indifference claim, but I do think there are sort of two ways that Mr. Maddox has exhausted his claims here. If we take the first three grievances, you do need to examine whether if we forget about the last two grievances. So in other words, if you disagree with our analysis on the interaction between PLRA and Rule 15, you have to look to the first three grievances to see whether those exhausted his claims as to the two doctors. So to a certain extent, you have to look at the facts of the grievances to decide whether they put prison officials on notice of the problems that Dr. Pandy was complaining about. Now, I agree with you that if you agree with our position on the PLRA, the interaction between PLRA and Rule 15, that you don't have to get as into the facts of the first three grievances. You could decide just on the last two grievances with respect to both doctors. All right. Let me ask you one question on that. We don't need to get into this problem at the present time of the prison system thinking that the treatment that the petitioner here claims is too expensive. That's right. I'm sure the courts have had to deal with that as the prison system itself, but we don't have anything about that before us, right? That's right. That's right. Okay. Thank you. Thank you. Have your rebuttal. Good morning, Your Honors. Good morning. My name is Alan Soros, Michigan Attorney General's Office, and I'm here representing Drs. Pandy and Borchardine. I'd actually like to start with, Judge Merritt, your last question to opposing counsel. I think factually that is not a decision that either Dr. Pandy or Borchardine were involved with. That was strictly a decision made by corrections or Corizon. So when we use the term corrections individuals, that wasn't our doing. But as far as these grievances, let's first talk about the three pre-complaint grievances. Nowhere in those grievances does Mr. Maddox ever name Dr. Pandy, which by the department's policy he's required to do. And the real interesting thing is if you look at actually the third grievance, which is the JCF 1974, he names 11 people but still fails to name Pandy. And we know the first two grievances, 1632 and 1747, talked about events before any allegations in the complaint as to Dr. Pandy. Counsel, could I ask you this? Is the question before us a procedural question about whether when a prisoner has additional complaints after having filed an action under the statute, the prisoner may amend after exhausting administrative remedies, may amend the original petition to include the new material? Is that the basic question before us? That is the big question before this panel, yes. Now, what would be the alternative procedure that you would suggest? The alternative procedure is once you exhaust additional allegations or claims, file a new complaint. I mean, there was nothing that prohibited him from filing another complaint for allegations that happened two years after the fact. What's the difference between amending the old complaint and filing a new complaint? Procedurally, there's a difference in the way you do the papers, but in terms of the efficiency of the process and the notice to the state and so on, what is the essential difference that would make it important that there be a brand new lawsuit with a new number filed in the district court? Well, and I'd first like to point out as a panel of this court and Cox v. Mayer. I don't care about precedent at the moment. I would just like to know the justice of the situation. There are several concerns that I would have. A decision saying that you can file amended complaints once you exhaust new allegations, in my belief, would tend to encourage the filing of amended complaints and prolong or protect the current litigation. Other concerns are because of the way the PLRA is written and the requirements, a lot of times, and I would say in most instances, an answer is not filed to the complaint because the PLRA doesn't require that an answer be filed. It can't be defaulted. The court has to order the defendants to file an answer, which they can also waive. In this situation... Are you talking about the grievance or the complaint right now? I'm talking about the filing of the complaint and why we should, why there are the practical reasons against or practical reasons for requiring them to file a new complaint. So when they file these amendments, when a prisoner files an amendment, the court looks at it as an amendment of right, doesn't do the screening that the PLRA requires. I've never seen a court screen a... What screening do you want the court to have to do? The PLRA gives the trial court, actually requires that the trial court either screen the case to determine if it's frivolous, fails to state a claim, or is barred by immunity, and if so, dismiss that case. That does not apply to... The court loses that ability in the amending of the complaint because it's... It's aware of that when it focuses on a motion filed to test the complaint, either a motion to dismiss or to strip out certain claims or to grant summary judgment. So the court doesn't lose the ability to look at it. The court just looks at it at a later stage because it's already made an initial determination on the original complaint. So it sounds like to me what you're arguing is that it basically is an inconvenience to the defendants. No, I don't believe it's an inconvenience to the defendants. It's just the purpose of the PLRA was to get these cases in and get good cases in and get them done. And here you're giving an avenue, you're creating an avenue to allow this to be prolonged. In this instance, this is a matter where we talk about notice and everything. Dr. Pandya nor Dr. Borgering were even involved in this case when the amended complaints were filed and therefore had no opportunity to take them. But here, and I guess the problem I have with this argument is here you're talking about, okay, there should have been a new complaint filed, but there is a common nucleus of continuing facts and things that all of this derives from. So it seems to me that a new complaint there makes little sense because all of these things are sort of interwoven. It seems that way to me. I understand, and I've tried not to give the impression that I think the PLRA is perfect, but it is what it is. And we have to interpret it. Another point that I'd like to make is that if the term no action shall be brought deals with an initial action or an amended complaint, you also run into problems when the court does its screening for litigation strikes. Because when they screen for litigation strikes, a prisoner is only assessed a strike if the entire complaint is dismissed for being frivolous, barred by immunity, or fails a state of claim. So if you now say no action brought means also no claim brought, do the district courts then assess litigation strikes when one of the claims that are brought is dismissed as being, you know, failing one of the three tests there? If we adopt your rationale, are we saying that in the face of the PLRA that Rule 15 basically has no effect for those cases? We've already addressed that in our brief, that yes, the congressional intent trumps the court rule. Well, the PLRA doesn't say anything about how you amend pursuant to Rule 15. No, it does not. And I'm not saying that the PLRA prevents amendments of the complaints. I mean, clearly they can amend complaints where they've exhausted prior to the initiation of the lawsuit the bringing of the action. What the PLRA prohibits is exhausting your administrative remedies once you've already initiated the suit. And the Utley decision, Utley v. Campbell, I realize it's an unpublished decision of this court, but it is directly on point. And they say you can't do that. Thank you. Good morning. My name is Carly Van Thome, and I represent Adrian Neff, P.A., Adam Edelman, M.D., and Khorizan Health, Inc. Appellant is not pursuing any issues regarding Khorizan or Dr. Edelman. However, for the record, I would like to note that the cardiac catheterization was not initially approved because Mr. Maddow, the cardiac cardiologist, was not able to meet the criteria at that time. Therefore, there wasn't a medical need for that procedure. Later on in April 2012, he did indeed have that procedure after it was determined that the criteria were met and the findings were normal. What is the status of his health right now? Do you know? I don't have his current medical records. I'm sorry to say I can't answer that. Maybe his counsel knows better. As far as the issue before us, we're looking at one night in August of 2011 when Ms. Neff was the on-call medical provider for the facility housing Mr. Maddox. Mr. Maddox complained to the nurse that he was having some chest pain and she consulted with P.A. Neff. An EKG was completed. Mr. Maddox had some nitro tablets, which he said were not giving him complete relief. And the nurse faxed Ms. Neff at home the EKG results. She reported Mr. Maddox's vital signs, which were normal. And she also gave Ms. Neff information regarding Mr. Maddox's very recent hospital visit. Mr. Maddox had gone to the hospital just a few weeks prior on July 26, 2011 after having similar complaints. At that time, he did not have a heart attack or other cardiac event. He did have one of the occasions when the hospital cardiologist had suggested doing a heart catheterization, but it wasn't done at that time. He went back to the facility. Do we have these questions before us now with regard to your client? Yes. With regard to my client's, this is the only issue that is still pending. Catheterization? No. Ms. Neff's decision on August 14, 2011 not to send Mr. Maddox to the hospital. And that was based on information including what had happened at the hospital just a few weeks earlier. Mr. Maddox had had a stress test also. She got that information. The stress test was normal. His EKG results were consistent. This goes to the question of deliberate indifference, right? Correct. And do we have that before us? Yes. As to Ms. Neff only. Because that was decided. Yes. This was a 12B6 motion. And Mr. Maddox's complaint was actually quite detailed as to the facts. He did include in there that the nurse had provided Ms. Neff with all of this information and that Ms. Neff then determined not to send him to the hospital at that time. He was given instructions to return if he was worsening. And in the morning on August 15, he was still complaining of chest pain. And at that time he saw a different provider, Dr. Rhodes, who decided to go ahead and send him to the hospital. Again, he didn't have a heart attack. He had no cardiac events. There was a suggestion for a heart catheterization, which Dr. Edelman chose not to proceed with because he didn't meet the criteria. Months down the road he did have that procedure and it was normal. But with regard to Ms. Neff, we're looking only at this one decision that she made. What would you like us to do? Are you arguing that the claim of deliberate indifference is not made out and should be dismissed? Yes. The district court should have dismissed it? The district court did dismiss it on a 12B6 motion. And you want us to affirm on appeal? Correct. And the district court found that there was no serious medical need. Additionally, there was no actual physical injury, which is required under the PLRA 42 U.S.C. 1997 E.E. Even if the complaints without having a heart attack or other cardiac event did constitute a serious medical need, Ms. Neff did provide some treatment. He had an EKG. He had nitro. His vital signs were assessed. He was examined and evaluated. Basically, whatever may be the case there, there's no causation of any harm. Right. There's no harm whatsoever. Even if there was a serious medical need here somehow, when he went to the hospital, the delay in him getting there did not cause him any harm. So under Napier, there would be no valid claim there. This is a classic case of disagreement with medical judgment. Now, subsequently, after being examined by your client, he was not found to have had a heart attack or any cardiac event that jeopardized his health, from what I understand. That's correct. So after medical judgment call was correct, there was no medical emergency on that night. I would also like to specifically point out that the Carter case that appellant cites is distinguishable because in that case, the prisoner actually did have a heart attack, a fatal heart attack, and so a serious medical need and an injury. And additionally, that case was dealing with corrections officers who were ignoring the prisoner's complaints. They're not medically trained to make a medical judgment call. They are not a PA who has stress test results, vital signs, EKG results, all of this information from the prior hospital visit at her disposal to exercise her medical judgment, which was, in fact, correct. This case is more like Brock v. Houchen that we cited in our brief, but in that case, Brock actually did have a heart attack. It was just that the medical provider's decision-making was not correct, but it was still a case of medical judgment. Also, another example similar to that is Burgess v. Fisher, which involved a prisoner who had head fractures, but they weren't identified not because the medical professional wasn't trying to assess and determine what was going on with the prisoner, but just because her judgment was not correct. Here we have correct judgment with no injury at all. So this case is actually better for Ms. Neff than these other cases were for those individuals. Basically, in the correctional environment, medical providers have to make tough judgment calls like this all the time. And when their judgment is right, it's not deliberate indifference, and it wouldn't be good policy to allow a claim like this to proceed in that case when they are right. Thank you. Thank you. Any rebuttal? To answer your question, Judge Merritt, my client is still experiencing recurrent chest pains, and he, in fact, is still getting the same drug that I was talking about earlier, this nitrite, which the prison officials, Dr. Pandya has even recognized that isn't effective at treating his heart condition. To address the- What is the drug that you say he should be getting? So at a certain point, Dr. Pandya approved a drug, Ronexa, which the doctors at the outside hospital were recommending that he get, and Dr. Pandya eventually gave him a six-month prescription for that. The script ran out, and he has not been able to get it since. But during that six-month period, he had no chest pains and had no side effects from that medication either. To address one point on Dr. Pandya, one additional point on Dr. Pandya, Mr. Maddox tried to identify Dr. Pandya in his third grievance. He named an MDOC doctor generically. And in looking at the record below, it indicates in his objections that he actually tried to get Dr. Pandya's name from the physician that was treating him immediately, Dr. Rhodes, but could not get his name. So he used the generic name, and then when he discovered the name, he named him in the lawsuit. And I don't think under those facts a strict enforcement of the MDOC's requirement to name those involved with the incident is appropriate here. First of all, the prison ended up figuring out Dr. Pandya was involved anyway. So saying Dr. Pandya's name in the first grievance doesn't get prison officials any more information than they ended up with at the end of the day. It also sets up a situation where defendants might be able to avoid litigation because subordinates are protecting their identity from inmates. They're sort of working behind the scenes. And it's not as if Mr. Maddox was trying to undermine the grievance process by knowing who Pandya was and not naming him. Your case against Ness seems to be pretty weak on this causation point. What do you say about that? Our position on PA Neff is that she got out on a 12B6 motion, so we're, of course, constrained to the face of the complaint. My client in the complaint alleges that she did get some information. The nurse who he saw provided PA Neff with information at around midnight on the night in question, and about three minutes later she called the nurse back and sent him back to the housing unit. I think from the face of the complaint we cannot tell, if we're constrained to the face of the complaint, what judgment or analysis PA Neff actually applied in making the decision to turn him over. Her point is there's no causation. My client doesn't have to have had a heart attack in order to have a deliberate indifference claim. And I think if she indeed made a differential diagnosis and applied her medical judgment in sending Mr. Maddox back to the housing unit. What damages would there be if you don't allege any adverse consequences? The pain and suffering that he went back to the housing unit and spent the night in pain until he had to go back to the doctor in the morning, and she sent him to the hospital. I thought that she called the doctor and spoke with him or got some consultation before making her recommendation or decision as to what should be done with your client, that it wasn't her medical judgment alone or perhaps not even principally. You may be confusing PA Neff with another nurse who is named in the complaints and named in the grievances and in the complaint. There's a nurse who ended up operating under the direction of Dr. Borgerding to deny Mr. Maddox Ronexa. But Nurse Murphy is the nurse that Maddox presented to in the housing unit, and she called PA Neff. And then PA Neff called back and said send him back to the housing unit. And if there's a record that PA Neff actually made this differential diagnosis and applied some judgment before sending Mr. Maddox back, I think PA Neff can do what Dr. Adelman did, which is answer the complaint, seek some limited discovery, get Mr. Maddox's medical records, and then move for summary judgment on the basis of those medical records. But from the face of the complaint, we don't know what analysis she applied. And did you say that after the nurse called PA Neff that only three minutes elapsed before Neff called back and said send him back to the cell? That's right. And it's not clear from the face of the complaint, and I don't know whether this ultimately matters, but it's not clear whether on the first phone call to PA Neff's house, Nurse Murphy actually spoke with PA Neff or left her a message. And, again, it was close to midnight, so I don't know. But three minutes elapsed and she called back and said send him back to the housing unit. Thank you very much. All right. Thank you. You're doing this pro bono, I take it? Yes, sir. Well, you are acting in the highest tradition of your profession. Thank you. Thank you very much, and the case is submitted.